UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
WELLS FARGO BANK, N.A., as Securities      :
Intermediary for Vida Longevity Fund, L.P.,  :
                                                              :
                                        Plaintiff,      :     **MEMORANDUM DECISION AND**
                                                              :     **ORDER**
                    -against-                          :
                                                              :     22-cv-6114 (BMC)
THE ESTATE OF CECILE GOLD,              :
                                                              :
                                        Defendant.   :
--------------------------------------------------------- X

**COGAN**, District Judge.

      This is an action to recover the death benefit proceeds of a life insurance policy that insured the life of Cecile Gold, who passed away in 2022. Vida Longevity Fund, L.P. bought the policy on the life settlement market from a third party in 2017. Both parties, plaintiff Wells Fargo, in its capacity as securities intermediary for Vida, and defendant Estate of Cecile Gold, contend that they are entitled to the proceeds of the policy. This case is before the Court on the parties' cross-motions for summary judgment. For the reasons that follow, Wells Fargo's motion for summary judgment is granted; the Estate's motion is denied.

## LEGAL STANDARD

      Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO

Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up)).

"Cross-motions for summary judgment do not alter [this] basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute." AFS/IBEX v. AEGIS Managing Agency Ltd., 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)). A court need not grant summary judgment for either party, "[r]ather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

The parties do not dispute that Wisconsin law governs this case, but of course "federal law applies to procedural issues," including the admissibility of evidence. See Sarkees v. E. I. Dupont De Nemours & Co., 15 F.4th 584, 588 (2d Cir. 2021) (citing Erie R. Co. v. Tompkins, 304 U.S. 64 (1938)); see also Wells Fargo Bank Nat'l Ass'n as Tr. for Holders of Comm 2014-UBS6 Mortg. Tr. Com. Mortg. Pass-Through Certificates v. 366 Realty LLC, 725 F. Supp. 3d 272, 290 (E.D.N.Y. 2024).

## UNDISPUTED FACTS

A District Court of Delaware case, dealing with a very similar situation to the one at issue here, summarized the relevant facts as follows:

> [Ms. Gold] learned that she could make money by taking out an unneeded life-insurance policy and then selling it. Rather than pay the premiums out of pocket, she funded them with a loan secured by the policy itself. That loan was administered by a [KBC Bank] company. When the loan came due, [Ms. Gold] sold the policy to another [KBC Bank] company. Because the sale price was more than the amount outstanding on the loan, she made a tidy sum, just as she had hoped. Meanwhile, the [KBC Bank] company turned around and resold [Ms. Gold's] policy. . . .

Est. of Berland by Gilman v. Lavastone Cap. LLC, No. 18-cv-02002, 2022 WL 15023450, at *1 (D. Del. Sept. 28, 2022).

Turning to the undisputed facts specific to this case: in 2007, Mark Gold, a life insurance agent and Ms. Gold's son, recommended that Ms. Gold have an insurance policy taken out on her life. They would use premium financing, by which lenders loan policyholders money to pay their insurance premiums, instead of the policyholders paying the premiums themselves. Then, for agreeing to have the insurance policy taken out (and, eventually, relinquishing the rights to the policy), Ms. Gold would receive payment. Ms. Gold agreed to this arrangement. Mark put his mother in touch with James Teegarden, a life insurance agent who Mark knew worked with premium financing lenders. Teegarden recommended the lender Timber Creek Financial LLC, and Ms. Gold signed a letter requesting sample loan documents from Timber Creek.

Ms. Gold then signed an agreement and declaration of trust creating the Cecile Gold 2007 Insurance Trust (the "Trust"). The initial beneficiaries of the Trust were Ms. Gold's two children, Mark and Laurie Gold. Mark was also listed as the investment trustee of the Trust, and a Wisconsin law firm, DeWitt Ross & Stevens S.C., was the administrative trustee. As the investment trustee, Mark had sole and absolute discretion to decide whether to acquire a life insurance policy, as well as the terms and conditions of such policies and loan documents.

On the same day the Trust was created, Mark, as investment trustee, signed a letter directing DeWitt Ross, as administrative trustee, to create one or more subsidiary trusts to purchase life insurance policies on the life of Ms. Gold and to arrange for any such policies to be financed through Timber Creek. The letter also directed DeWitt Ross to, *inter alia*, serve as the sole trustee of any subsidiary trusts that would be created.

Less than two weeks later, DeWitt Ross created the Cecile Gold 2007-1 Insurance Trust (the "Sub-Trust"), for which DeWitt Ross was the sole trustee. That same day, the Sub-Trust, through DeWitt Ross, applied for a life insurance policy on Ms. Gold's life.

Ms. Gold then signed yet another agreement, this time with Timber Creek, consenting to a loan from Timber Creek and assigning it the beneficial interest in the Sub-Trust. The Trust, through DeWitt Ross, also entered into an agreement with Timber Creek, granting it a security interest in the Trust's personal property, including the beneficial interests of the Sub-Trust, thus including any life insurance policy insuring Ms. Gold's life, to secure the Trust's repayment obligation on Timber Creek's loan. PHL Variable Insurance Company granted DeWitt Ross' application for a life insurance policy and issued the Sub-Trust a policy on Ms. Gold's life, which took effect when Timber Creek wired PHL the policy's first premium payment of $37,630.

Mark subsequently signed paperwork refinancing the Timber Creek loan with another lender, Lonsdale LLC. Pursuant to the refinancing, Lonsdale paid $90,000 into the Trust's bank account, which was transferred to Ms. Gold. In 2009, Mark received maturity date notices from Lonsdale stating that the loan from Lonsdale would mature in September of that year, and Mark could either pay off the loan in cash or surrender the policy on Ms. Gold's life in complete satisfaction of the loan. To pay off the loan, the Golds would have had to pay $620,000. Mark surrendered the policy.

After surrendering the policy, Ms. Gold and Mark provided annual medical updates on Ms. Gold's health to the policy's subsequent owner until Ms. Gold died in 2022.

The above sequence of events did not occur by happenstance. KBC Bank, a Belgian financial institution, and its related entities, ran the Timber Creek and Lonsdale premium

financing programs, for which DeWitt Ross provided legal advice.[1]  Through these programs, Timber Creek would loan money "to fund the purchase of life insurance policies issued in Wisconsin with death benefits in excess of One Million Dollars." Such loans would be "made to an irrevocable trust (the 'Family Trust') for the benefit of the Insured's spouse and/or children and more remote lineal descendants," and the life insurance policies would "be held by a separate trust (the 'Insurance Trust'). The beneficial interests . . . in the Insurance Trust [would then] be held by the Family Trust." "At the time of purchase, the Family Trust [would pledge] its entire beneficial interest in the Insurance Trust . . . to [Timber Creek], as collateral security for the unpaid balance of principal and interest oweing [sic] under the Loan." This is the exact process by which Ms. Gold's life insurance policy was acquired and how her loan from Timber Creek was structured to pay her insurance premiums. Of the 159 life insurance policies financed with loans from Timber Creek, 157 of them – including Ms. Gold's – were ultimately surrendered to Lonsdale.

---

[1] Wells Fargo has objected to virtually all of the documents the Estate cites to describe KBC's premium financing program, asserting that they have not been authenticated and are inadmissible hearsay. Regarding its authenticity argument, Wells Fargo does not "affirmatively contest the authenticity of the documents," and "[a]bsent a genuine challenge to authenticity, a failure to proffer evidence establishing that a document is authentic does not preclude a court from considering the document when deciding a motion for summary judgment." Chasewood v. Kay, No. 18-cv-623, 2020 WL 70857, at *1 (E.D.N.Y. Jan. 6, 2020) (citations omitted). Moreover, the documents supporting the facts relevant to this decision have all been produced in discovery, and "the act of production implicitly authenticate[s] the documents." John Paul Mitchell Sys. v. Quality King Distributors, Inc., 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000).

Wells Fargo's hearsay arguments about these documents are also unavailing. "Documents may be admitted as business records under Rule 803(6), even though they are not the business records of one of the parties." In re Blech Sec. Litig., No. 94-cv-7696, 2003 WL 1610775, at *5 (S.D.N.Y. March 26, 2003) (citing United States v. Consolidated Edison Co. of N.Y., 580 F.2d 1122, 1131 n.18 (2d Cir. 1978); Schactman Fagan, Inc. v. Winthrop Labs., Inc., No. 82-cv-8398, 1985 WL 3126, at *1 (S.D.N.Y. Oct. 15, 1985)). "The key determination as to whether a document falls under the business record exception to the hearsay rule is whether the document is trustworthy." Id. (citation omitted). Here, the relevant documents are clearly trustworthy business records of nonparties DeWitt Ross and NorthStar Life Services, LLC, the servicer of the policy for a subsequent owner of the policy (after it was sold by Lonsdale but before it was sold to Vida). The documents were prepared within the parties' regular business activity (DeWitt Ross: providing legal advice, NorthStar: servicing loans), and they were prepared before any potential for litigation, and therefore motive to lie, arose. These documents thus constitute business records under Federal Rule of Evidence 803(6).

When Ms. Gold signed the paperwork to create the Trust and take out the loan from Timber Creek, Mark and Ms. Gold understood that they were participating in this premium financing program.  Neither Ms. Gold nor Mark ever intended to pay off the loan and retain the life insurance policy – they always intended to surrender the loan, for which they knew they would receive $90,000.  From the beginning, they understood the policy as having been taken out for the benefit of third-party strangers.[2]

After Ms. Gold's passing in 2022, Vida, having bought the policy on the life settlement market in 2017, submitted a claim for the proceeds of the life insurance policy to PHL, the issuer of the policy.  Upon learning of the Estate's competing claim to the death benefit, Wells Fargo brought this case in its capacity as securities intermediary for Vida.  PHL has deposited the death benefit, plus interest, into the Court's registry.

## DISCUSSION

Under Wisconsin law, "[n]o insurer may knowingly issue a policy to a person without an insurable interest in the subject of the insurance."  Wis. Stat. § 631.07(1).  In other words, a person who takes out a life insurance policy must have an interest, either financial or familial, in the life of the insured continuing instead of ending prematurely.  However, Wisconsin law does not automatically void a policy that lacks an insurable interest.  Rather, if a policy lacks an insurable interest, "a court with appropriate jurisdiction may order the proceeds to be paid to someone other than the person to whom the policy is designated to be payable, who is equitably

---

[2] Wells Fargo attempts to create a dispute as to this fact by citing Teegarden's testimony that "Mark Gold knew every option available in the marketplace" and that "he was up to speed at what the various options were for financing his mom's policy."  But this testimony, suggesting that Mark knew he could eventually pay off the Timber Creek (and, later, Lonsdale) loan in cash instead of surrendering the policy in satisfaction of the loan, does nothing to undermine Mark's testimony that he never expected to pay off the loan in cash and retain the policy.

entitled thereto, or may create a constructive trust in the proceeds or a part thereof."  Wis. Stat. § 631.07(4).

Wells Fargo argues that the life insurance policy, as conveyed to Vida, satisfies Wisconsin's insurable interest requirement.  In the alternative, Wells Fargo argues that the Estate is not equitably entitled to the proceeds of the policy even if the policy lacks an insurable interest.  The Estate asserts that the policy is unsupported by a valid insurable interest and that the Estate is equitably entitled to the proceeds of the policy.

## I.    Insurable Interest

Whether a policy carries a valid insurable interest is determined at the time of the issuance of the policy.  Luebke v. Vonnekold, 250 Wis. 496, 500, 27 N.W.2d 458, 460 (1947).  As long as a policy contains an insurable interest at the policy's inception, the policyholder may validly assign the policy to another holder, even if that holder does not have an insurable interest in the insured's life.  See Wis. Stat. § 632.47(1) ("the owner of any rights under a life insurance policy . . . may assign any of those rights").

In considering whether there is a valid insurable interest at the time of issuance, Wisconsin law dictates that courts must look beyond the form of a transaction to its substance.  See Kopperud v. Chick, 27 Wis. 2d 591, 595, 135 N.W.2d 335, 337 (1965); Ramsdell v. Ins. Co. of N. Am., 197 Wis. 136, 221 N.W. 654, 655 (1928); Rent-A-Ctr., Inc. v. Hall, 181 Wis. 2d 243, 253, 510 N.W.2d 789, 794 (Ct. App. 1993).  If the parties intend, at the inception of a life insurance policy, that someone without an insurable interest will receive the proceeds of the policy, that policy lacks an insurable interest, regardless of who is listed as the original beneficiary.  See Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A., 44 F.4th 1024, 1036 (7th Cir. 2022) (applying Illinois law, which also requires an insurable interest at the

inception of life insurance policies, and finding no insurable interest because "no one expected" the insured to retain the proceeds of the policy); United States v. Carpenter, 190 F. Supp. 3d 260, 264, 267 (D. Conn. 2016), aff'd sub nom. United States v. Bursey, 801 F. App'x 1 (2d Cir. 2020) ("if the purchase [of the policy] was financed by an investor who intended to take ownership of the policy at the end of a period of time," that policy has no insurable interest); LincolnWay Cmty. Bank v. Allianz Life Ins. Co. of N. Am., No. 11-cv-5907, 2015 WL 7251931, at *4 (N.D. Ill. Nov. 17, 2015) (also applying Illinois law, and finding no insurable interest because "the default state of affairs from the start – if nothing more were to happen – is that the stranger would own the policy," even though insured's son was involved in procuring the policy and the insured's wife was the original beneficiary of the policy).

From the outset of the transactions through which a life insurance policy was taken out on Ms. Gold's life, all of the involved parties expected and intended a third party to receive the proceeds of the policy. Thus, there was no "insurable interest present at the inception of [the] policy of life insurance." Albrent v. Spencer, 275 Wis. 127, 137, 81 N.W.2d 555, 560 (1957) (citation omitted).

Mark's involvement in the procurement of the policy does not change this analysis, even though he had an insurable interest in his mother's life and was involved in the transactions to procure the policy. Because the parties involved in procuring a policy on Ms. Gold's life, including Mark and Ms. Gold, never intended Mark to actually receive the proceeds of the policy, his participation does not transform the policy into one with an insurable interest. Courts around the country, applying state laws that require an insurable interest in a policy at the time of the policy's inception and that look to policies' substance over form, consistently find that policies lack an insurable interest despite the involvement of parties with insurable interests in

8

the policy.  See, e.g. LincolnWay, 2015 WL 7251931 (insured's son was involved in procuring the policy and the insured's wife was the original beneficiary of the policy); Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A., 238 N.J. 157, 208 A.3d 839 (2019) (insured's grandson was initially a trustee of the trust that held the life insurance policy, signed the life insurance application as trustee, was the initial beneficiary of the policy, and then resigned as trustee so that other trustees, strangers to the insured, would receive the policy's proceeds).

## II.    Equitable Entitlement

Having determined that the insurance policy on Ms. Gold's life lacked an insurable interest from its inception, the Court next considers whether the Estate is equitably entitled to the proceeds of the policy pursuant to Wisconsin Statute § 631.07(4).  Wells Fargo asserts that the Estate is not equitably entitled to the proceeds based on the doctrines of unclean hands, laches, ratification, waiver, and estoppel.

The clean hands requirement, also referred to as the unclean hands doctrine, "means that an applicant [for equitable relief] will be denied relief if it appears that the predicament of which he or she complains is the result of his or her own wrongful or unlawful course of conduct." Hendricks v. M.C.I., Inc., 152 Wis.2d 363, 368, 448 N.W.2d 289, 292 (Wis. Ct. App. 1989) (citation omitted).  "Before a court may deny a [party] relief in equity upon the 'clean hands' doctrine, it must clearly appear that the things from which the [party] seeks relief are the fruit of its own wrongful or unlawful course of conduct."  S & M Rotogravure Serv., Inc. v. Baer, 77 Wis. 2d 454, 467, 252 N.W.2d 913, 919 (1977) (citation omitted).

"[U]pon the death of the decedent, the decedent's personal representative 'stands in the shoes' of the decedent to pursue any claims the decedent may have had."  Christ v. Exxon Mobil Corp., 362 Wis. 2d 668, 691, 866 N.W.2d 602, 613 (2015) (citation omitted).  Thus, "the estate

is entitled only to what the decedent would have had if the decedent were living." <u>Est. of Merrill ex rel. Mortenson v. Jerrick</u>, 231 Wis. 2d 546, 554, 605 N.W.2d 645, 650 (Ct. App. 1999) (citation omitted).  Accordingly, in determining whether the unclean hands doctrine bars equitable relief for the Estate, the Court considers the cleanliness of the decedent, Ms. Gold's, hands.

"Misconduct which will bar relief in a court of equity need not necessarily be of such nature as to be punishable as a crime, or to constitute the basis of legal action. Under this maxim, any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean." <u>David Adler & Sons Co. v. Maglio</u>, 200 Wis. 153, 228 N.W. 123, 125 (1929) (quotation omitted).  One way a party may act wrongfully such that it would bar equitable recovery is for the party to be involved in the transaction through which she gains rights, and then ignore those rights for years.  For example, in <u>Schultz v. Schultz</u>, 104 Wis. 2d 739, 313 N.W.2d 279 (Ct. App. 1981) (unpublished), the appellant obtained a divorce from the respondent, but then continued to live with him, purchased a mobile home with him, moved with him several times, and filed joint tax returns with him.  When, eight years after the divorce, the appellant moved to enforce the property settlement provisions of the divorce judgment claiming that she did not realize the parties' divorce was legitimate, the Wisconsin Court of Appeals affirmed the trial court's holding that "appellant did not come to the court with 'clean hands' and was therefore not entitled to relief." <u>Id.</u>  The court found unclean hands even though the appellant's conduct was not criminal in any way, and the appellant stated she had not known she could enforce her rights for the eight years she delayed in bringing the suit.

Here, too, Ms. Gold was involved in obtaining the life insurance policy her Estate now contests, with full awareness of the terms of the transaction she was entering into, and she abided by that transaction (to her benefit, in the form of $90,000) for over fourteen years until she died. Whether she knew that issuing a life insurance policy without an insurable interest violated the law is immaterial to whether her actions were sufficiently wrongful to bar equitable recovery. Her actions, even lacking this knowledge, suffice.

Because Ms. Gold participated in, benefited from, and knowingly surrendered the proceeds from the transaction at issue, her Estate may not now claim that it was free from wrongdoing in the completion of that transaction.

The Estate argues that the unclean hands doctrine should not apply here, because it would be "in contravention of the public policy of the state." But Wisconsin's public policy on this issue is plainly communicated in its statute: if a policy lacks an insurable interest, "a court . . . may order the proceeds to be paid to someone other than the person to whom the policy is designated to be payable, *who is equitably entitled thereto*." Wis. Stat. § 631.07(4) (emphasis added).

Wisconsin law establishes a completely different public policy than some other states: rather than finding policies without an insurable interest void, the proceeds of such policies are to be "paid to someone other than the person to whom the policy is designated to be payable" *if* they are "equitably entitled thereto." Wis. Stat. § 631.07(4).[3] Wisconsin law specifically

---

[3] Thus, the Estate's reliance on Lavastone Cap. LLC v. Est. of Berland, 266 A.3d 964 (Del. 2021), for the proposition that, under Wisconsin law, applying the doctrine of unclean hands in favor of a party without an insurable interest is contrary to public policy, is misplaced. Lavastone applied Delaware state law, which codifies a different public policy than that clearly expressed by the Wisconsin legislature. Delaware law provides that policies without insurable interest are void *ab initio* and that, if parties entered into such policies, "the individual insured or the individual's executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them." 18 Del. C. §§ 2704(a), (b). Thus, the Delaware legislature explicitly "prescribed that the estate should receive the proceeds of the policy as a matter of public policy," such that "equitable principles do not apply." Lavastone, 266 A.3d at 974 (footnote omitted).

instructs courts to consider whether nonbeneficiaries are equitably entitled to the proceeds of a life insurance policy, which includes considering whether such nonbeneficiaries have unclean hands.  See Hendricks, 152 Wis. 2d at 368, 448 N.W.2d at 292 ("[I]t is well settled that one seeking affirmative equitable relief must have 'clean hands' before the court will entertain his or her plea." (citing S & M Rotogravure, 77 Wis. 2d at 466, 252 N.W.2d at 918-19)).

The Estate urges this Court to "exercise its equitable discretion in a way that would discourage human-life wagers" by preventing Vida, "the human-life wagerer, from reaping the fruits of its illegal wager."  What the Estate omits is that Ms. Gold also participated in, and received a benefit from, this human life wager.  She was *in pari delicto*.  The same facts that show that the policy had no insurable interest also show that Ms. Gold had unclean hands in bringing about the policy.

If Wisconsin wants to declare all stranger-originated life insurance transactions are payable to the insured's estate, regardless of the identity of the policyholder, it can certainly do so.  See 18 Del. C. § 2704(b).  But it has not.  Instead, it has decided that the proceeds are payable to the policyholder, unless there is someone else who is equitably entitled to the proceeds.  See Wis. Stat. § 631.07(4).  This Court is not going to substitute its judgment for that of the Wisconsin legislature and courts.

The Estate's argument that the common law forecloses the application of the unclean hands doctrine also fails.  In Cammack v. Lewis, 82 U.S. 643 (1872), the plaintiff, Cammack, had his debtor, Lewis, take out and assign to him a $3,000 life insurance policy, for which Cammack would pay the premiums, to cover a $70 debt.  When Lewis died, Cammack recovered the proceeds of the policy.  The Supreme Court held that the transaction "was a sheer wagering policy," regardless of "the fact that the policy was taken out in the name of Lewis and assigned

by him to Cammack." Id. at 647-48. Other than the amount necessary to repay Lewis' debt to Cammack, the Supreme Court affirmed that the rest of the proceeds of the life insurance policy were to be recovered by Lewis' estate.

The Estate interprets Cammack as holding that an estate is entitled to the proceeds of a life insurance policy, even if "Mr. Lewis's participation in the scheme was not entirely consistent with 'fair dealing.'" In reality, the Supreme Court explained that it did "not fully appear" "[w]hether Lewis was a participant in the fraud," but it seemed that "he never supposed more would be claimed by Cammack than what he owed him" and "there [was] nothing proved against [Lewis] inconsistent with that view of the matter, and with his fair dealing." Id. at 648. Accordingly, the Supreme Court concluded that it "did not see such evidence on [Lewis'] part of a corrupt transaction, as to forbid the court from doing justice between his administratrix and Cammack." Id. In contrast to the Estate's interpretation, the Supreme Court's analysis explicitly depended on the lack of evidence of Lewis' participation in the fraud, and if there was such evidence, it would have "forbid[den] the court from doing justice between" the parties, meaning that Cammack would have retained the proceeds. Id. Where, as here, there is evidence of Ms. Gold's participation in obtaining the policy that lacks an insurable interest, Cammack counsels that this Court is forbidden from fashioning an equitable remedy for the Estate.

Similarly, Warnock v. Davis, 104 U.S. 775 (1881), recognized the application of the unclean hands doctrine in determining who is entitled to a policy that lacks an insurable interest. In Warnock, the Supreme Court held that the widow of the insured, not a trust association that was listed as the beneficiary of the insured's policy, was entitled to the proceeds of the policy taken out on the insured's life. In doing so, the Supreme Court clarified that "[a]lthough the agreement . . . was invalid . . . *it was not of that fraudulent kind with respect to which the courts*

13

*regard the parties as alike culpable and refuse to interfere with the results of their action*." Id. at 781 (emphasis added). Just as the Supreme Court stated in Cammack, where parties are "alike culpable" in entering into a transaction, courts will not disturb the consequences of their bargain.

Next, the Estate argues that policies that lack an insurable interest are not assignable, and so "the Policy never left the hands of the Trust, [so] any proceeds of the Policy . . . redound to the Estate." However, Wisconsin law provides that "[n]o insurance policy is invalid merely because the policyholder lacks insurable interest or because consent has not been given," Wis. Stat. § 631.07(4), and "the owner of any rights under a life insurance policy . . . may assign any of those rights." Wis. Stat. § 632.47(1). The Estate is correct that no one may convey more than he owns, and so any assignment of a policy that lacks an insurable interest is an assignment of that right subject to the rights of "someone . . . who is equitably entitled" to the proceeds of the policy. Wis. Stat. § 631.07(4). This is of no moment, though, because the Estate is not equitably entitled to the proceeds of the policy.

Finally, the Estate's contention that Wells Fargo must show that Vida is equitably entitled to the proceeds of Ms. Gold's life insurance policy to obtain the proceeds is unavailing. Wisconsin law requires a party to show that it is equitably entitled to the proceeds of an insurance policy if that party is "someone *other than* the person to whom the policy is designated to be payable." Wis. Stat. § 631.07(4) (emphasis added). Here, Vida is the party to whom the policy is designated to be payable. Thus, to receive the proceeds of the policy, Vida need only show that the Estate is *not* equitably entitled to them, which it has done.

Because the doctrine of unclean hands prevents the Estate from recovering the proceeds of the life insurance policy, this Court does not consider whether the other defenses to equitable entitlement apply.

## CONCLUSION

For the foregoing reasons, Wells Fargo's motion for summary judgment is granted and the Estate's motion for summary judgment is denied.

**SO ORDERED.**

*Brian M. Cogan*
_____
                U.S.D.J.

Dated: Brooklyn, New York
       July 1, 2025